**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ALEXIS WILKINS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 1:25-cv-1375** |
| | § | |
| **KYLE M. SERAPHIN,** | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| *Defendant.* | § | |

**DEFENDANT KYLE M. SERAPHIN'S MOTION TO DISMISS**
**PLAINTIFF'S ORIGINAL COMPLAINT**

In her Complaint, Plaintiff Alexis Wilkins ("Ms. Wilkins") is targeting Defendant Kyle M. Seraphin, a well-known conservative Catholic journalist and podcaster, former Federal Bureau of Investigation ("FBI") Special Agent, and government whistleblower, whose popular podcast "The Kyle Seraphin Show" attracts a large audience hungry for independent-minded, conservative political commentary. Ms. Wilkins is attempting to use Mr. Seraphin's humorous, sarcastic, and hyperbolic reference to news stories about Ms. Wilkins and her boyfriend, FBI Director Kash Patel ("Director Patel"), as a means of punishing and stifling Mr. Seraphin's free speech and criticism of Director Patel in Mr. Seraphin's podcast. On the Complaint's face, those statements do not constitute defamation. Thus, Mr. Seraphin moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) because it fails to demonstrate that he (1) made any statements of fact (2) with actual malice. This Court should grant this motion.

## I.      INTRODUCTION

Mr. Seraphin is a former FBI agent-turned-podcaster who is successful in large part because of his insightful, witty, humorous, tongue-in-cheek commentary about the operation of the U.S. government including the FBI. In an August 22, 2025 podcast episode of "The Kyle

Seraphin Show," titled "DESPERATE FBI Director Digs Deep into . . . John Bolton's Mustache?," Mr. Seraphin briefly discussed Director Patel's relationship with Ms. Wilkins, asking in joking, hyperbolic fashion why Ms. Wilkins, who is much younger than Director Patel, would be dating Director Patel if it were not for his position as the leader of the FBI. In doing so, Mr. Seraphin discussed a well-known fact—Ms. Wilkins herself acknowledges that her relationship with the FBI Director is "public" and "widely known" and acknowledges that other news commentators discussed these same topics before Mr. Seraphin (Dkt. 1, ¶¶ 7, 11).

Her Complaint openly acknowledges that Mr. Seraphin's statements were "ridiculous" and "ludicrous"—which alone demonstrates they cannot constitute defamation because a reasonable person would not have believed them to be fact. (Dkt. 1, ¶¶ 14, 23). As explained below, long before Mr. Seraphin ever made these remarks, Ms. Wilkins responded to other media commentators with large followings who gave much more pointed commentary on these topics, laughing it off and chalking it up to the life of a "public figure." But while she is fine with her and others conversing publicly about these topics, she does not want Mr. Seraphin to do so. This Court should reject Ms. Wilkins' effort to single out Mr. Seraphin and suppress his free speech because she has failed to—and, indeed, cannot—state a proper claim for defamation based on Mr. Seraphin's "ridiculous" and "ludicrous" podcast statements.

## II.    BACKGROUND FACTS

### A.    Mr. Seraphin, a Former FBI Special Agent, Is a Prominent Conservative Commentator, with a Sarcastic, Hyperbolic Style, Who Is Widely Known As An Influential Critic of Director Patel.

Mr. Seraphin is a veteran of the U.S. Air Force. From June 2016 until June 2022, he served as an FBI Special Agent, receiving regular promotions, as well as annual awards for his performance on duty and for work beyond the scope of duty. While serving as a member of the

FBI's Counterintelligence Division[1] in Washington DC, he requested and received a transfer to the FBI's Washington Field Office ("FBI WFO") Intelligence Division. FBI WFO is a significant office within the FBI because it is responsible for all manners of investigations into federal crimes in the National Capital Region. During his tenure at FBI WFO, Mr. Seraphin gained a deep understanding of the FBI WFO's senior management, policies, protocols, procedures, and key personnel.

Between late 2021 and late 2022, Mr. Seraphin gained national notoriety as a "whistleblower" for refusing to participate in the FBI's mandatory vaccine policy and for reporting what he alleged to be potential perjury by Attorney General Merrick Garland in connection with the Attorney General's remarks to Congress concerning the use of Counterterrorism Resources assigned to parents protesting at schoolboard meetings nationally. On June 1, 2022, the FBI permanently suspended Mr. Seraphin from his position, after which he gave his first public interview in September 2022 about his whistleblower activity. (*See* Spencer Brown, *Whistleblower: FBI Putting 'Threat Tags' on Parents Protesting School Boards*, HOUSE JUDICIARY COMMITTEE REPUBLICANS (Nov. 16, 2021, 4:45 P.M.), https://judiciary.house.gov/media/press-releases/whistleblower-fbi-putting-threat-tags-on-parents-protesting-school-boards, attached hereto as Exhibit A).

In January 2023, Mr. Seraphin started podcasting as the host of the "Kyle Seraphin Show," a podcast that airs weekly on various media platforms. Mr. Seraphin describes himself in every episode of the show's introduction as a "civil liberties enthusiast, Second Amendment defender,

---

1    Contrary to Ms. Wilkins' Complaint, Mr. Seraphin never served in the FBI's Counterterrorism Division. (*See* Dkt. 1, ¶ 8). Nor did Mr. Seraphin ever "personally [meet] Ms. Wilkins with Mr. Patel at a conservative political event roughly two years ago"—or at any other time—because Mr. Seraphin has never met Ms. Wilkins. (*Id.* ¶ 14).

and recovering FBI agent." (*See, e.g.*, Exhibit B, Transcript of The Kyle Seraphin Show, DESPERATE FBI Director Digs Deep into…John Bolton's Mustache? | Ep 637, p. 1, 00:11).

He has appeared in hundreds of print publications, television interviews, radio shows, and podcasts.

Using this platform he created with his resources, including information from government contacts and former FBI agents, he has called out what he believes to be the improper, politically motivated use of the FBI and other government resources. For example, in February 2023, he made national news by exposing an FBI intelligence internal memorandum from the FBI's Richmond Division that linked "radical traditionalist Catholics" with white supremacists, which served as the focal point of a Congressional investigation on these topics. (*See* Kyle Seraphin, *The FBI Doubles Down on Christians and White Supremacy in 2023*, UNCOVERDC (Feb. 8, 2023), https://uncoverdc.com/2023/02/08/the-fbi-doubles-down-on-christians-and-white-supremacy-in-2023#google_vignette, attached hereto as Exhibit C; Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, *The Weaponization of "Disinformation" Pseudo-Experts and Bureaucrats: How the Federal Government Partnered with Universities to Censor Americans' Political Speech*, HOUSE JUDICIARY COMMITTEE (Nov. 6, 2023), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2024-12/Part-3-Final-Weaponization-Report-Compilation.pdf).

Mr. Seraphin has been a vocal critic of Director Patel's decision to promote longtime FBI Agent Steven Jensen to a senior position at the FBI WFO, citing Mr. Jensen's role in overseeing the handling of the January 6th prosecutions. According to a recent court filing in the District of Columbia, as a result of the widespread criticism of Director Patel's decision to promote Mr. Jensen, Director Patel urged Mr. Jensen to sue "the more prominent online personalities for

defamation," including Mr. Seraphin, as a means of "tak[ing] the political pressure off of [Director Patel] for his decision to promote Jensen." *See Driscoll, et al. v. Patel, et al.*, Case No. 1:25-cv-03109 (USDC), Dkt. 1 at ¶¶ 122, 127, page 35 n.6 (stating that "one of the online personalities [Director] Patel suggested Jensen sue had coincidentally also been fixated on Plaintiff Spencer Evans, as discussed in further details herein") & page 42 n.8 (identifying Mr. Seraphin as the online personality who purportedly was fixated on Mr. Evans). According to this Complaint filed by former FBI agents, Director Patel offered to "connect [Mr.] Jensen with defamation attorneys." *Id.* ¶ 127.

In this way, Mr. Seraphin serves as a strong, insightful, and independent voice who offers a critical perspective that is different from that espoused by current FBI leadership. His reporting has also put him in the crosshairs of Ms. Wilkins and her powerful boyfriend, Director Patel.

**B. Ms. Wilkins, a Self-Described "Country Music Artist" and "Conservative" Political Activist, Publicly Brushed Off the Exact Same Allegedly Defamatory Statements Forming the Basis of This Lawsuit—Long Before Mr. Seraphin Ever Sarcastically Mentioned Those Topics on His Show.**

Since at least July 2009, Ms. Wilkins has been in the entertainment industry. Ms. Wilkins describes herself as a "country music artist," "published writer," and "conservative" political activist. (Dkt. 1, ¶ 7). In January 2023, Ms. Wilkins began a romantic relationship with Director Patel—which Ms. Wilkins describes as "widely known" and the subject of "public knowledge." (Dkt. 1 ¶¶ 7, 11).

Starting no later than February 2025, based on certain features of Ms. Wilkins' and her employer PragerU's background, news commentators, journalists, and others began expressing opinions and making jokes that she is an Israeli or "Mossad" agent and "honeypot" who is only in a relationship with Director Patel to obtain sensitive information from him.

On February 23, 2025, for example, @BasedSamParker, a social media influencer account on X with over 79,000 followers, posted a viral thread that gathered over 2.5 million impressions. The post stated, among other things:

> 1/ WHO IS ALEXIS WILKINS—Girlfriend of Kash Patel? Alexis Wilkins was a devout 24-yr old Christian when she met Kash Patel, a 42-yr old Hindu Muslim & started dating him. Now he's the FBI director. She's also the press secretarty [sic] for Abraham Hamadeh, a Syrian Muslim member of the US House of Representatives from Arizona, and a "former" member of US Military Intelligence. She's also a country music singer based out of Nashville. She works for PragerU, is tight with The Daily Wire, & has ties to TPUSA[.] She hosts her own news & political commentary show on Rumble. Let's take a closer look at Alexis, pictured here 3 weeks after meeting Kash Patel in 2022.

> 6/ Isreali [sic] Influence: PragerU & Daily Wire PragerU is run by Marissa Streit, who served in the IDF Unit 8200 (roughly equivalent to the NSA)—who has sworn an oath of loyalty to israel [sic]. IOW, PragerU is an operation of israeli [sic] intelligence. Everyone knows about The Daily Wire and where their allegiance belongs.

(*See* Sam Parker (@BasedSamParker), X.com (Feb. 24, 2025, 3:57 A.M.), https://archive.ph/h7X2v; https://x.com/BasedSamParker/status/1893872813930655996, attached hereto as Exhibit D).[2]

Likewise, on February 28, 2025, @IanMalcolm84, a social media account on X with over 95,000 followers, posted: "'Boy, do I hate being right all the time' @Kash_Patel's girlfriend works with the JEWISH founded @prageru whose CEO was in the ISRAELI DEFENSE FORCE & 8200 INTELLIGENCE AGENCY? Can we spell 'handler'?" The post registered over 116,000 impressions. (Ian Malcolm, (@IanMalcolm84), X.com (Feb. 28, 2025, 3:01 P.M.), https://x.com/IanMalcolm84/status/1895580008594489794, attached hereto as Exhibit E).

---

[2] Mr. Seraphin requests that the Court take judicial notice of this, and other posts described herein, and related podcast interviews, newspaper articles, government documents, and court filings—not for their truth, but as evidence that the statements were made. *See* FED. R. EVID. 201(b)(2); *see also Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996). Mr. Seraphin further asks that, regardless of what the Court considers in terms of documents, exhibits, or other citations, it not transform this motion to dismiss into a motion for summary judgment.

On July 7, 2025, Dr. Simon Goddek, another prominent X commentator who has over 1.1 million followers, referred to Ms. Wilkins as a "classic honey pot," stating: "Exactly. Alexis Wilkins is twenty years younger than Kash and works for an NGO that's basically Israeli intelligence. And seriously, why would an attractive young woman date a not so attractive Indian American? **Classic honey pot**." (Dr. Simon Goddek (@goddeketal), X.com (Jul. 7, 2025, 4:22 P.M.),                                         https://archive.ph/D0BuC#selection-613.0-613.229, https://x.com/goddeketal/status/1942257954251473210 (emphasis added), attached hereto as Exhibit F).

On July 10, 2025, in a post that gathered more than 574,000 views, Ms. Wilkins addressed this extensive public commentary, stating:

> I've spent my career saying no to anything that would compromise my character and working to restore America. It's disappointing to see people with no real contribution to political discourse spin ridiculous conspiracy theories out of thin air. These accusations are obviously insanely ridiculous and coming from accounts that are farming because their engagement dried up after Trump's win.

(Alexis Wilkins (@AlexisWilkins), X.com (Jul. 9, 2025, 3:50 P.M.), https://archive.ph/MO27T; https://x.com/AlexisWilkins/status/1943050167130746916, attached hereto as Exhibit G).

Director Patel's personal spokesperson and publicist, Erica Knight, responded to Ms. Wilkins' post, using the exact same allegedly defamatory language that is the subject of this lawsuit, stating: "For anyone still curious: Kash Patel was never married and did not leave the imaginary children from this nonexistent marriage in a nonexistent luxury Hamptons mansion for a (not Jewish, Christian country singing) **Mossad Honeypot**." (Erica Knight (@_EricaKnight), X.com    (Jul.    11,    2025,    12:30    A.M.),    https://archive.ph/ZKk0V; https://x.com/_EricaKnight/status/1943467906907672946 (emphasis added), attached hereto as Exhibit H).

**C.    Before Mr. Seraphin Ever Made Any Comments, Ms. Wilkins Participated In High-Profile Media Interviews, Calling The Rumors "Funny" and "Truly Hilarious" and Laughing About the Situation.**

On July 30, 2025, Ms. Wilkins participated in a video interview with high-profile media personality Megyn Kelly on "The Megyn Kelly Show," titled "Country Singer and Kash Patel's Girlfriend Alexis Wilkins on the Need to Speak Out About What's True." In this interview, Ms. Wilkins directly addressed opinions that she is "an Israeli spy" and "work[s] for Mossad." (*See* Megyn Kelly, *Country Singer and Kash Patel's Girlfriend Alexis Wilkins on the Need to Speak Out About What's True*, The Megyn Kelly Show (Jul. 30, 2025), https://www.youtube.com/watch?v=kCQkaSxMtcQ; Exhibit I, Transcript of The Megyn Kelly Show, *County Singer and Kash Patel's Girlfriend on the Need to Speak Out About What's True*, at p. 1, 01:02-01:49). Ms. Wilkins acknowledged that she understood how people could reach the wrong conclusions based on certain "pieces of evidence" about her, explaining, "people see certain pieces and I get it. They want to connect things . . . there's pieces of this that, you know, I can, I, I understand but I think that they have taken just these pieces of evidence that you laid out and tied them together in all of the wrong ways." (*Id.* at p. 1, 01:52-02:11).

During the interview, Ms. Wilkins specifically addressed prior suggestions, based on facts in her background, that she is a "honeypot" spy. She laughed it off and agreed with Ms. Kelly that she would have been "really playing the long game" given that Ms. Wilkins met Director Patel some time before he was appointed to this position. (*Id.* at p. 2, 05:39-05:43). Ms. Wilkins further stated that she did not understand how people could misunderstand her background because she has lived her life "very publicly." (*Id.* at p. 2 6:16-6:23). This video interview received over 116,000 views.

That same day, in a separate video interview on "The Megyn Kelly Show" titled "FBI Director Kash Patel's Girlfriend Alexis Wilkins Responds to Internet Trolls Who Say She's

Mossad," Ms. Kelly played online video commentary for Ms. Wilkins from an online media "influencer" personality who summarized the claim that Ms. Wilkins is part of an Israeli "honeypot" operation connected with PragerU. (Megyn Kelly, *FBI Director Kash Patel's Girlfriend Alexis Wilkins Responds to Internet Trolls Who Say She's Mossad*, The Megyn Kelly Show (Jul. 30, 2025), https://www.youtube.com/watch?v=S10WGaxrSlI; Exhibit J, Transcript of The Megyn Kelly Show, *FBI Director Kash Patel's Girlfriend Alexis Wilkins Responds to Internet Trolls Who Say She's Mossad*, at p. 1, 00:52-02:22).

After playing the video, Ms. Kelly acknowledged PragerU's CEO's affiliation with Israeli military intelligence but stated "there is nothing like that about [Ms. Wilkins]." (*Id.* at p. 1, 02:22-02:41). Appearing to acknowledge PragerU's connection with Israeli military intelligence, Ms. Wilkins responded, among other things, "I knew that, you know, that Prager was, this is kind of something that, I think, people on the deep sides of the internet like to pick at, you know, when they can't figure out what else is wrong, so, uh, some of it didn't surprise me when it first started coming up." (*Id.* at p. 2, 02:50-03:03). Ms. Wilkins concluded that such rumors are part of the life of a "public figure," stating, "I've been a public figure for long enough to see, you know, people try to pick at my, you know, family, try and find people online. This is something that people do." (*Id.* at p. 2, 6:06-06:15). This video interview received over 145,000 views.

On August 4, 2025, Ms. Wilkins participated in a video interview with songwriter journalists on the "Try That In a Small Town Podcast," titled "Bison Heads and Spy Accusations – A Chat w/Alexis Wilkins." (*Bison Heads and Spy Accusations – A Chat w/ Alexis Wilkins :: Ep 67*, Try That in a Small Town Podcast (Aug. 4, 2025), https://www.youtube.com/watch?v=ZipsSEtZb84). An interviewer asked Ms. Wilkins, "Would you ever consider getting into politics?" (*See* Exhibit K, Transcript of Try That in a Small Town

Podcast, *Bison Heads and Spy Accusations – A Chat w/ Alexis Wilkins :: Ep 67*, p. 1, 25:24-25:30). Another interviewer responded, "She already is," prompting laughter by all. (*Id.* at p. 1, 25:31). They then asked Ms. Wilkins, "Can you still run for office if you're a spy?"— prompting more laughter by all and another interviewer to say, "That's a great question." (*Id.* at p. 1, 26:46-26:52.) Ms. Wilkins joined in the hilarity, stating, "Someone had to take the air out of the balloon." (*Id.* at p. 2, 26:59). One of the interviewers stated, "Knowing you, it gave me a really good laugh, because if you are a spy, you're a really good spy—you're like a super good spy," to which Ms. Wilkins agreed, stating "I should have taught classes, honestly, yeah." (*Id.* at p. 2, 27:06-27:15). During this exchange, Ms. Wilkins stated, "it's funny," and "[y]eah, there's elements of it that I think are truly hilarious." (*Id.* at p. 2, 27:15-27:29).

During this same interview, Ms. Wilkins expressed surprise that she has received negative commentary from conservatives, stating, "I always thought that the left would, would cancel me, but apparently, I was too educational and brought too many people over to our side and it was the right thinking they found something instead." (*Id.* at p. 2, 29:13-29:23). This prompted an interviewer to state, "There are stupid people all over," to which Ms. Wilkins responded, "They're all over the place—they hand that stuff out for free." (*Id.* at p. 2, 29:23-29:29). In these ways, Ms. Wilkins both (1) acknowledged that there were facts in her background that people could connect to make these suggestions, and (2) personally joked about and made fun of the suggestions.

**D.    After Mr. Seraphin Sarcastically Referenced These Rumors On His Podcast—All in the Context of Criticizing Director Patel—Ms. Wilkins Filed This Suit.**

On August 22, 2025, in an episode of the "The Kyle Seraphin Show" that was especially critical of Director Patel, Mr. Seraphin interviewed former FBI Agent and whistleblower Stephen Friend. (Kyle Seraphin, *DESPERATE FBI Director Digs Deep into…John Bolton's Mustache? | Ep 637*, The Kyle Seraphin Show (Aug. 22, 2025),

https://open.spotify.com/episode/2bXjDPd8geMlKS8nyLhE9F?si=db7d3f08388d42ad&nd=1&d
lsi=3a10bef3c08c455c.). Mr. Seraphin and Mr. Friend discussed various challenges facing
Director Patel's FBI administration and the likelihood that Director Patel is "about to get replaced"
by newly appointed FBI Co-Deputy Director Andrew Bailey. (*See* Exhibit B, p. 2, 13:08-13:15).

    Mr. Seraphin asked Mr. Friend, "Is it fair that you share the same analysis that I do that
there is no chance you bring in somebody [Andrew Bailey] to help you with your job because you
are doing a great job?" (*Id.* at p. 2, 13:47-13:56). In response, Mr. Friend said, "No, I think that
that's spot on—and particularly because of the individual that was brought in, him being in those
discussions to take the top helm there. That to me speaks very loudly." (*Id.* at p. 2, 13:57-14:06).

    During this episode, Mr. Seraphin and Mr. Friend also discussed journalist Kerry Picket's
March 3, 2025, article, "Kash Patel disputes whistleblower revelation about FBI 'honeypot' agent
spying on Trump campaign," citing Director Patel's dispute about the use of the term "honeypot"
to describe a female undercover FBI agent. (Kerry Picket, *Kash Patel disputes whistleblower
revelation about FBI 'honeypot' agent spying on Trump campaign*, The Washington Times (Mar.
3,     2025),     https://www.washingtontimes.com/news/2025/mar/3/kash-patel-disputes-
whistleblower-revelation-fbi-honeypot-agent/, attached hereto as Exhibit L). Mr. Seraphin took
issue with Director Patel's defense of the FBI, as well as Ms. Picket's definition of "honeypot" as
"an undercover operative who feigns sexual or romantic interest to obtain information from a
target." (Exhibit B, p. 5, 1:01:10-1:01:18). Mr. Seraphin stated: "[a honeypot is] not necessarily
that. It's that the possibility exists because the person actually presents, like, an attraction. You
don't have to actually feign anything, um, and the FBI has no problem using these by the way if
you follow Trevor Aaronson and the 'Alphabet Boys' thing that happened in Denver." (*See id.* at
p. 5, 1:01:19-1:01:35.; *see also* Trevor Aaronson, *The FBI Used an Undercover Cop With Pink*

*Hair to Spy on Activists and Manufacture Crimes*, The Intercept (Mar. 21, 2023, 6:00 A.M.), https://theintercept.com/2023/03/21/fbi-colorado-springs-surveillance/, attached hereto as Exhibit M).

Mr. Seraphin sarcastically stated that "Kash Patel takes umbrage with the word 'honeypot,' not anything else," implying that Director Patel should instead be concerned about the FBI's improper use of "honey pot" investigative tactics. (Exhibit B, p. 6, 1:02:13-1:02:17). Mr. Seraphin also took the position that senior FBI agents who personally participated in undercover "honeypot" investigations should not hold management positions within the FBI. (*Id*. at p. 5, 1:00:40).

In the context of this larger discussion, Mr. Seraphin made the following sarcastic, tongue-in-cheek remarks, which were plainly not made with malice or animus against Ms. Wilkins:

> [Director Patel has] had his own little honeypot issue that's been going on of late. So we're just gonna acknowledge it real publicly. He's got a girlfriend that's half his age who apparently is both a country music singer, a political commentator on Rumble, a friend now of John Rich through [Dan] Bongino, who also owns a big chunk of Rumble, and she's also a former Mossad agent in what is like the equivalent of their NSA. But I'm sure that's totally because like she's really looking for like a cross-eyed, you know, kind of thickish built, super cool bro, who's almost 50 years old, who's Indian in America. Like it has nothing to do with the fact that we're really close to the Trump administration. Anyway, I'm sure that that's totally just like love. That's what real love looks like.

(*Id.* at p. 6, 1:01:59-1:03:00).

Mr. Seraphin then speculated that, to Director Patel's detriment, FBI agents from the New York Field Office convinced Director Patel to take issue with the term "honeypot" as a means of undermining and discrediting him, and made other comments critical of Director Patel. (*Id*.; *see also id*. at p. 8, 1:11:44-1:11:58) ("I think [Patel] freaked the hell out and realized that his tenure and his smiling celebration of Andrew Bailey becoming the Co-Deputy Director was actually him smiling and, and, like congratulating his own replacement whether he realized it or not.")).

On August 25, 2025, Toria Brooke (@realToriaBrooke), a conservative social media influencer with connections to Ms. Wilkins and Director Patel, posted on Mr. Seraphin's remarks, causing them to be widely circulated. (*See* Toria Brooke (@realToriaBrooke), X.com (Aug. 25, 22025,                 8:34                 P.M.),                 https://archive.ph/2025.08.30-165545/https://x.com/realtoriabrooke/status/1960153785923149874#selection-615.0-657.235 (receiving over 182,300 views), attached hereto as Exhibit N). On August 27, 2025, five days after Mr. Seraphin's episode aired and two days after Ms. Brooke's post, Ms. Wilkins pounced—filing this defamation lawsuit against Mr. Seraphin in which she paradoxically claims that he defamed her but that his statements were "ridiculous" and "ludicrous" such that no one could believe them. This motion follows.

## III.    ARGUMENTS AND AUTHORITIES

### A.    The Applicable Legal Standards Require More than Conclusory Statements to Support a Legal Cause of Action.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In deciding a Rule 12(b)(6) motion, the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. DART*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (internal quotations omitted)). A court is not required to accept legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement as true. *Iqbal*, 556 U.S. at 678.

"Generally, a court ruling on a [12(b)(6)] motion to dismiss may rely only on the complaint and its proper attachments," as well as "'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citations omitted). "In considering a 12(b)(6) motion, the Court can

properly consider the transcripts of the podcast attached to Defendants' Motion because the allegedly defamatory statements were made in the podcast." *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 528 (W.D. Tex. 2021) ("Plaintiff's Complaint referred to the podcast throughout and the podcast is central to Plaintiff's claims, so the podcast and its transcripts can be considered for the 12(b)(6) Motion").

**B.    Under These Standards, Plaintiff's Defamation Claim Fails as a Matter of Law.**

Ms. Wilkins' Complaint alleges one claim—defamation—despite the fact that Mr. Seraphin's statements were clearly sarcastic, tongue-in-cheek, and hyperbolic. To establish a cause of action for defamation, Ms. Wilkins must adequately allege that Mr. Seraphin (1) published a statement, (2) that was defamatory concerning the plaintiff, (3) while acting with the requisite degree of fault, and (4) in some cases, that the statement proximately caused damages. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). As a matter of law and based on her own pleadings, Ms. Wilkins cannot establish that the statement was defamatory or that Mr. Seraphin acted with the requisite degree of fault. Thus, her Complaint cannot survive this motion to dismiss.

**1.    Mr. Seraphin's Sarcastic, Humorous, and Hyperbolic Statements That Ms. Wilkins Is a "Honeypot" and "Former Mossad Agent" Are Not Defamatory.**

Whether a statement is capable of the defamatory meaning a plaintiff alleges is a question of law. *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—2003). "[D]efamation claims involving humor in general, and satire in particular, raise important issues pertaining to free speech" because "'[h]umor is an important medium of legitimate expression and central to the well-being of individuals, society, and their government.'" *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 151 (Tex. 2004) (quoting ROBERT D. SACK, SACK ON DEFAMATION § 5.5.2.7.1 (3d ed. 2004)). For this reason, "'[d]espite its typical literal 'falsity,' any effort to

control it runs severe risks to free expression as dangerous as those addressed to more 'serious forms of communication.'" *Id.* (recognizing that rhetorical hyperbole is protected speech under the First Amendment); *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (reasoning that "'imaginative expression' [and] 'rhetorical hyperbole[,]' which has traditionally added much to the discourse of our Nation," cannot reasonably be interpreted as stating actual facts about an individual).

Indeed, "[c]ommon sense tells us there must be" a recognized exception from the laws of libel when words otherwise defamatory are uttered in a humorous context. *Isaacks*, 146 S.W.3d at 151 (citations omitted); *see also Letter Carriers v. Austin*, 418 U.S. 264, 283-84 (1974) (nonliteral, hyperbolic use of terms "scab" and "traitor" are not actionable defamation); *Hustler Magazine v. Falwell*, 485 U.S. 46, 53-57 (1988) (no liability where parody could not reasonably be understood as describing actual facts about the plaintiff); *Busch v. Viacom Int'l, Inc.*, 477 F. Supp. 2d 764, 775 (N.D. Tex. 2007) (court determined as a matter of law that no reasonable viewer would have believed the challenged clip contained assertions of fact about the plaintiff when plaintiff's image appeared in a fake endorsement on a satiric program).

The Texas Supreme Court has "long held that an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Isaacks*, 146 S.W.3d at 154 (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)). "Falsity for constitutional purposes depends upon the meaning a reasonable person would attribute to a publication, and not to a technical analysis of each statement." *Id.* at 154-55 (citing *Turner*, 38 S.W.3d at 116). "[T]he test is whether the publication could be reasonably understood as describing actual facts." *Id.* at 157.

The person of "ordinary intelligence" is "a prototype of a person who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *Id.* (citing *Turner*, 38 S.W.3d at 114). The test is objective, not subjective. *Id.* Of particular importance here, this hypothetical reasonable reader "can tell the difference between satire and sincerity." *Isaacks*, 146 S.W.3d at 157 (quoting *Patrick v. Superior Court*, 22 Cal. App. 4th 814, 821 (Cal. Ct. App. 1994)). "Thus, the question is not whether some actual readers were mislead [sic], as they inevitably will be, but whether the hypothetical reasonable reader could be." *Id.* (citations omitted). "In a case of parody or satire, courts must analyze the words at issue with detachment and dispassion, considering them in context and as a whole, as the reasonable reader would consider them." *Id.* at 158. Further, "a reasonable person reads communications in their entirety and is aware of relevant contemporary events, and they are "equipped with the national, historical, and temporal context" of the statement. *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363, 368 (Tex. 2023).

Here, Mr. Seraphin's statements clearly constituted imaginative expression, satire, humor, and rhetorical hyperbole. Ms. Wilkins' own Complaint admits this, calling the statements "ridiculous" and "ludicrous." (*See* Dkt. 1, ¶¶ 14, 23). The statements intended to convey that there may be an ulterior motive for Ms. Wilkins' relationship with Director Patel through purposefully over-the-top representations that a reasonable listener would not believe were assertions of fact. This reading of the statements is bolstered by the fact that, in interviews, Ms. Wilkins has joked about the "honeypot" and "Mossad agent" references made by other commentators. She herself finds them "truly hilarious"—but she sued Mr. Seraphin for repeating them in his humorous, tongue-in-cheek style.

Given the context of the statement—a political podcast—and the subject of the statement—a politically involved public figure in a relationship with a high-profile administration official—a reasonable listener would understand that Mr. Seraphin's comments were merely a brief attempt at humor, satire, and rhetorical hyperbole in an effort to make news of the day interesting to listeners. *See Isaacks*, 146 S.W. 3d at 151 (recognizing that "[s]atire is particularly relevant to political debate because it tears down facades, deflates stuffed shirts, and unmasks hypocrisy," and "[b]y cutting through the constraints imposed by pomp and ceremony, it is a form of irreverence as welcome as fresh air."); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 182-183 (S.D.N.Y. 2020) (recognizing that even outright accusations of crimes may constitute "rhetorical hyperbole," that they are unlikely to be defamatory when "made in connection with debates on a matter of public or political importance," and that "[t]his is especially true in the context of commentary talk shows[.]"); *see also* Dkt. 1, ¶ 1 (referring to Mr. Seraphin as "a podcaster and political commentator—profiting on controversy and outrage[.]").

### 2. Ms. Wilkins Failed to Allege Actual Malice.

#### a. Ms. Wilkins Is a General or Limited-Purpose Public Figure.

A public figure suing for libel "must shoulder the heavy burden of showing that the defendants acted with 'actual malice'"—a burden exclusive to those in this status. *Brueggemeyer v. American Broadcasting Cos.*, 684 F. Supp. 452, 454 (N.D. Tex. 1988) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). Actual malice is defined as knowledge that the publication was false or to act with reckless disregard of whether it was false or not. *Id.*

Questions concerning a defamation plaintiff's status are matters of law for the Court to decide. *Trotter v. Jack Anderson Enters.*, 818 F.2d 431, 433 (5th Cir. 1987). "Public figures fall into two categories: (1) all-purpose, or general-purpose public figures, and (2) limited-purpose

public figures." *McLemore*, 978 S.W.2d at 571. "General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts." *Id*. (citing *Gertz v. Robert Welch*, 418 U.S. 323, 351 (1974)). "Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a particular public controversy." *Id*. (citing *Gertz*, 418 U.S. at 351). The Fifth Circuit has adopted a three-part test to determine whether an individual is a limited-purpose public figure: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id*. (citing *Trotter*, 818 F.2d at 433).

Under these standards, Ms. Wilkins is a high-profile country singer, published writer, and political commentator who lives her life "very publicly," and even describes herself as a "public figure." (*See* Dkt. 1, ¶ 7; Exhibit I, at pp. 3-4, 06:59-07:09; Exhibit J, at p. 3, 6:06-06:15). Further, it is "widely known" that she is dating Director Patel, and by her own admission, "[i]t is public knowledge that [she] and Dir. Patel are in a long-term relationship[.]" (Dkt., ¶¶ 7, 11). These facts establish Ms. Wilkins' status as a public figure. *See Brewer v. Memphis Pub. Co.*, 626 F.2d 1238, 1255 (5th Cir. 1980) (finding that the plaintiff was a public figure not only because she was a singer in her own right, but also because she was in a relationship with Elvis Presley); *Corsi v. Infowars LLC*, No. A-20-CV-298-LY, 2021 U.S. Dist. LEXIS 98486, at *3, 20 (W.D. Tex. May 24, 2021) (author and political commentator is a public figure).

Alternatively, Ms. Wilkins' relationship with Director Patel establishes that she is a limited-purpose public figure. Applying the Fifth Circuit's standards as to limited-purpose public

figures, the "controversy"—her relationship with Director Patel—is public, and she, of course, has more than a trivial or tangential role in that relationship as evident by her interviews on talk shows. Accordingly, Ms. Wilkins is required to establish that Mr. Seraphin made his statements with actual malice.

>    **b.    Ms. Wilkins Has Failed to Allege Facts Demonstrating That Mr. Seraphin Made His Statements With Knowledge of Their Alleged Falsity or With Reckless Disregard for Their Truth.**

Ms. Wilkins has not alleged facts sufficient to show actual malice. In an effort to allege that Mr. Seraphin knew his statements were false, Ms. Wilkins notes that she met Mr. Seraphin one time. (*See* Dkt. 1, ¶ 14). While Mr. Seraphin disputes ever meeting Ms. Wilkins, even taking her allegation as true, such a "meeting" even if it occurred does not establish Mr. Seraphin's purported awareness that she is not a "honeypot" or "former Mossad agent."

Ms. Wilkins proceeds to allege, in conclusory fashion and without imputing this knowledge to Mr. Seraphin, that she is not Jewish, that she has never been an agent for any intelligence agency, and that Mr. Seraphin "knows" his suggestions were "vile and ridiculous." (Dkt. 1, ¶ 14). These, and her other conclusory allegations that Mr. Seraphin "maliciously lied," "falsely assert[ed]," and spread "malicious and knowing lies," are insufficient to state a claim. (Dkt. 1, ¶ 1). *See Twombly*, 550 U.S. at 555 (observing that to survive a motion to dismiss, plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Thus, she fails to establish that Mr. Seraphin knew his statements were allegedly false or made the statements with a reckless disregard for the truth.

As Ms. Wilkins' own pleadings acknowledge, and the Statement of Facts demonstrates, political commentators were questioning her affiliation with Israel even before Mr. Seraphin's statements. (Dkt. 1, ¶ 23). Yet Ms. Wilkins did not sue the other commentators who made these statements—nor does she allege that Mr. Seraphin was in possession of specific information

establishing the falsity of these matters. Instead, she admitted that the public information available about her might lead commentators to draw the "wrong" conclusions, stating she understood how commentators "want to connect things" and "they have taken just these pieces of evidence . . . and tied them together in all of the wrong ways." (*See* Exhibit I, at p. 1, 01:52-02:11). If anything, Ms. Wilkins' acknowledgment *before Mr. Seraphin's remarks* that the comments made by others were "funny" and "truly hilarious"—and her joking that she "should have taught classes [on how to be a spy], honestly"—support Mr. Seraphin's position that he did not act with actual malice. (*See* Exhibit K, p. 2, 27:15-27:29). All of this prevents Ms. Wilkins from establishing that Mr. Seraphin knew of the alleged falsity of these allegations or made his statements with reckless disregard for the truth.

Ms. Wilkins' allegation that Mr. Seraphin has not reached out to her fares no better, because Mr. Seraphin was under no obligation to contact her, and she does not assert that she ever informed Mr. Seraphin that she was not a "honeypot" or "former Mossad agent." (*See* Dkt. 1, ¶ 23).

## IV.    CONCLUSION

Ms. Wilkins filed this lawsuit to silence a critic of her and Director Patel. Mr. Seraphin's statements were non-actionable imaginative expressions, satire, and rhetorical hyperbole. Because her Complaint contains only conclusory allegations, the Court should dismiss it and reject her attempt to use the judicial system as a tool to silence the opinions of someone with whom she disagrees. Mr. Seraphin respectfully requests the opportunity to present oral argument in support of this motion.

Respectfully Submitted:

/s/ Daniel J. Hall

**CHRISTOPHER D. KRATOVIL**
State Bar No. 24027427
**DANIEL J. HALL**
State Bar No. 24118946
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
E-mail: CKratovil@dykema.com
E-mail: DHall@dykema.com
Tel.: (214) 462-6400
Fax: (214) 462-6401
**ATTORNEYS FOR DEFENDANT KYLE M. SERAPHIN**

/s/ Edward J. Loya, Jr.

**EDWARD J. LOYA, JR.**
State Bar No. 24103619
**DORSEY & WHITNEY LLP**
200 Crescent Court, Suite 1600
Dallas, Texas 75201
Email: loya.edward@dorsey.com
Tel.: (214) 981-9919
Fax: (214) 981-9901
**LEAD ATTORNEYS FOR DEFENDANT KYLE M. SERAPHIN**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served in accordance with the FEDERAL RULES OF CIVIL PROCEDURE upon all parties on this the 4th day of November, 2025.

/s/ Daniel J. Hall
Daniel J. Hall