UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALEXIS WILKINS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 1:25-cv-1375 |
| | § | |
| KYLE M. SERAPHIN, | § | ORAL ARGUMENT REQUESTED |
| | § | |
| *Defendant.* | § | |

### DEFENDANT KYLE M. SERAPHIN'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Defendant Kyle M. Seraphin ("Mr. Seraphin"), and submits this, his Reply in Support of Motion to Dismiss Plaintiff's Original Complaint. In support thereof, Mr. Seraphin would respectfully show unto the Court as follows:

#### I.   INTRODUCTION

The breaking national and international news coverage about Ms. Wilkins and her controversial relationship with Director Patel has only intensified in recent weeks. *See*, *e.g.*, Alan Feuer, Adam Goldman, and Glenn Thrush, *Patel Under Scrutiny for Use of SWAT Teams to Protect His Girlfriend*, N.Y. TIMES, Nov. 23, 2025, https://www.nytimes.com/2025/11/23/us/politics/kash-patel-girlfriend-fbi-protection.html; Marni Rose McFall, *Full List of People Being Sued by Kash Patel's Girlfriend Alexis Wilkins*, NEWSWEEK, Nov. 11, 2025, https://www.newsweek.com/alexis-wilkins-kash-patel-fbi-defamation-sam-parker-kyle-seraphin-elijah-schaffer-11029236.[1] Ms. Wilkins filed suit against Mr. Seraphin to stifle his free speech as someone who is critical of her and her boyfriend, FBI

---

[1] Mr. Seraphin respectfully requests that the Court take judicial notice of the existence of these articles.

**DEFENDANT KYLE M. SERAPHIN'S REPLY IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT**                                                                 **PAGE 1**

Director Kashyap Patel ("Director Patel"). Ms. Wilkins' politically-motivated litigation tactics have not stopped there—since the inception of this lawsuit, Ms. Wilkins has filed suit against two other individuals for making similar comments in Case Nos. 9-25-CV-81334 and 2:25-cv-00987, seeking no less than $5,000,000.00 in each of the three lawsuits. The Court should bring to an end Ms. Wilkins' assault on her critic Mr. Seraphin's First Amendment rights and grant Mr. Seraphin's Motion to Dismiss.

## II. ARGUMENTS AND AUTHORITIES

### A. Ms. Wilkins Concedes That Mr. Seraphin's Request for Judicial Notice Is Proper.

Courts may take judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. FED. R. EVID. 201(b)(2). The exhibits attached to Mr. Seraphin's Motion to Dismiss reflect statements made on social media and in podcasts, and the Court can accurately and readily determine that those statements were, in fact, made. All of the sources for which Mr. Seraphin has requested judicial notice are court documents, government publications, national or international news media sources, and social media posts that are readily verifiable—and Ms. Wilkins has offered no basis to question to the accuracy of any of these sources. Ms. Wilkins acknowledges that the Court can take judicial notice of these exhibits "for its existence, and not for the truth of the contents within." Dkt. 13, at p. 4; *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents"). Mr. Seraphin expressly requested that the Court take judicial notice of these documents not for their truth, but as evidence that the statements were made. Dkt. 10, p. 6 at n. 2. Thus, Ms. Wilkins agrees that the Court may take judicial notice of the existence of these statements.

**B.    Mr. Seraphin's Statement Was Not Defamatory Because The Average Reasonable Viewer or Listener of Mr. Seraphin's Statement Would Not Understand the Statement as Conveying Facts.**

The Texas Supreme Court has "long held that an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) (compiling cases). "Falsity for constitutional purposes depends upon the meaning a reasonable person would attribute to a publication, and not to a technical analysis of each statement." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (the law "provides protection for statements that cannot 'reasonably be interpreted as stating actual facts' about an individual," which "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation.") (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 53-55 (1988)). This inquiry is objective, and asks how a "hypothetical reasonable reader" or "average listener" would understand the statement, not how any particular reader or listener actually understood it. *Polk Cnty. Publ'g Co. v. Coleman*, 685 S.W.3d 71, 77 (Tex. 2024) (citations omitted). The hypothetically reasonable reader, or average listener, "is aware of relevant contemporary events," and they are "equipped with the national, historical, and temporal context" of the statement. *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363, 368 (Tex. 2023).

Ms. Wilkins cites *Dickson v. Lilith Fund for Reprod. Equity* for the definition of hyperbolic statements but conveniently omits the language from the opinion providing that "[a]s for rhetorical hyperbole, such often are characterized as extravagant exaggerations utilized for rhetorical effect . . . or vigorous epithets." *Dickson v. Lilith Fund for Reprod. Equity*, 647 S.W.3d 410, 414 (Tex. App.—Amarillo 2021), *aff'd*, 662 S.W.3d 355 (Tex. 2023). In *Lilith Fund*, the Amarillo Court of

Appeals found that an outspoken advocate for an ordinance decrying *Roe v. Wade* did not defame Lilith Fund for Reproductive Equity by accusing it of being a criminal organization and committing murder, because the accusation was "opinion masquerading as fact" under the entire context of the conversation had. *Id*. at 412. Thus, *Lilith Fund* supports Mr. Seraphin's position.

Similarly, *Letter Carriers v. Austin*—another case cited by Ms. Wilkins for the applicable legal standard—supports Mr. Seraphin's position that the use of buzzwords like "honeypot" and "former Mossad agent" in a loose, figurative sense to express criticism does not constitute defamation. 418 U.S. 264, 282-83 (1974) (recognizing that words like "traitor" and "scab" cannot be construed as representations of fact when used in a loose, figurative sense to demonstrate a union's strong disagreement with the views of those workers who opposed unionization and that it was "impossible to believe that any reader . . . would have understood the newsletter to be charging the appellees with committing the criminal offense of treason").

Ms. Wilkins is incorrect that Mr. Seraphin's statements should not be taken as satire or hyperbole merely because he describes himself as a "real whistleblower" who presents the "uncomfortable truth" on his podcast that "has no time for comforting lies." Dkt. 13, at p. 7. Ms. Wilkins' argument wrongly assumes that the average listener has no sense of humor and cannot understand sarcasm. Not only does this conclusion not follow logically from the podcast's introduction—or the majority of the podcast episode at issue in which Mr. Seraphin uses satire and hyperbole to maintain the listeners' interest—but it also contradicts established authority that the objectively reasonable observer "can tell the difference between satire and sincerity." *Isaacks*, 146 S.W.3d at 157 (quoting *Patrick v. Superior Court*, 27 Cal. Rptr. 2d 883, 887 (Cal. Ct. App. 1994)).

Ms. Wilkins' attempt to distinguish *Isaacks* from the instant case is unconvincing. Dkt. 13, at pp. 10-11. The Court in *Isaacks* considered whether "the reader was given obvious clues that

the piece was not conveying statements of actual facts" and considered many of the sarcastic statements contained in the article at issue in that case. 146 S.W.3d at 158. The Court in *Isaacks* concluded that "[t]hese clues (among others) 'involve exaggeration or distortion,' the means by which 'the satirist clearly indicates to his audience that the piece does not purport to be a statement of fact but is rather an expression of criticism or opinion, a means of reaching an abstract truth or idea.'" *Id*. (citation omitted). Among the "obvious clues" that the Texas Supreme Court considered was the publisher's "general and intentionally irreverent tone . . . as well as the satire's timing and commentary on a then-existing controversy." *Id*. at 161.

Here, Mr. Seraphin's statement contained similar clues, including Mr. Seraphin's sarcastic tone and the controversy surrounding Director Patel's relationship with Ms. Wilkins. Mr. Seraphin noted that Director Patel has "got a girlfriend that's half his age," and that "she's really looking for like a cross-eyed, you know, kind of thickish built, super cool bro . . . Like it has nothing to do with the fact that we're really close to the Trump administration. Anyway, I'm sure that that's totally just like love. That's what real love looks like." *See* Exhibit B to Motion to Dismiss, at p. 6, 1:01:59-1:03:00. The average listener of this podcast, who is aware of relevant contemporary events and can tell the difference between sincerity and satire, would understand the gist of Mr. Seraphin's statement to be criticizing Director Patel's relationship in a humorous fashion, and not actually conveying facts about Ms. Wilkins, an individual to whom he did not refer by name.

Ms. Wilkins' characterization of Mr. Seraphin's statement as accusing her of espionage and treason does not change the analysis. It is well established that talk show commentary on alleged criminal activity is not defamatory if it relates to matters of public or political importance. *McDougal v. Fox News Network, LLC* instructs that "accusations of crimes also are unlikely to be defamatory when, as here, they are made in connection with debates on a matter of public or

political importance." 489 F. Supp. 3d 174, 182 (S.D.N.Y. 2020). The court found that "[t]his is especially true in the context of commentary talk shows like the one at issue here, which often use 'increasingly barbed' language to address issues in the news." *Id.* at 182-83 (citing RODNEY A. SMOLLA, 1 LAW OF DEFAMATION § 6:92 (2d ed.)). Ms. Wilkins acknowledges that Mr. Seraphin made his statement, albeit with barbed language, on a podcast while discussing matters of public or political importance; it makes no difference that Mr. Seraphin made these remarks in the context of a public interview on these topics as opposed to an actual "debate" with an adversary.

*Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002), does not support Ms. Wilkins' position. In that case, the defendant (1) expressly testified that he intended the word's ordinary meaning—dishonest, unethical, shady, and unscrupulous; (2) plainly and repeatedly stated that his accusations of corruption were based on actual fact; (3) repeatedly insisted that evidence he had seen supported his assertions; and (4) argued at trial that his statements were verifiably true and could be proved. *Id.* at 581, 583, 584. None of these circumstances are present in this case—and unlike *Bentley*, Mr. Seraphin's statement, spoken on his politically charged podcast show, was intended as, and was, rhetorical hyperbole and imaginative expression.

### C.    Ms. Wilkins Is a Public Figure.

Although Ms. Wilkins argues that "[a]t the motion to dismiss stage, it cannot be determined whether Ms. Wilkins is a general or limited-purpose public figure," the question of public-figure status is one of constitutional law for courts to decide. Dkt. 13, at p. 13; *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). "General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts." *McLemore*, 978 S.W.2d at 571. "Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a

particular public controversy." *Id*. The Fifth Circuit has adopted a three-part test to determine whether an individual is a limited-purpose public figure: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.*

"To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question." *Id*. at 572. "The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Id*. Exhibits B, D, E, F, G, H, I, J, K, L, and N to Mr. Seraphin's Motion to Dismiss all demonstrate that there is a public controversy surrounding Director Patel's relationship with Ms. Wilkins.

"In considering a libel plaintiff's role in a public controversy, several inquiries are relevant and instructive," including (1) whether the plaintiff actually sought publicity surrounding the controversy, (2) whether the plaintiff had access to the media, and (3) whether the plaintiff "voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation." *Id*. at 573 (citations omitted). Here, each of these elements is met. Ms. Wilkins touts her background as "a patriotic, conservative, Christian country music artist and published writer, who also works for a conservative advocacy and educational company" and states her relationship with Director Patel has been "widely known" since September 2024. Dkt. 13, at p. 1. She also claims that her relationship is the subject of "public knowledge" and that she "posted photos of herself with Dir. Patel on X[.]" Dkt. 1, at ¶¶ 7, 11. Ms. Wilkins took to X and

various podcasts to access the media and increase her exposure with respect to this relationship. *See* Exhibits G, I, J, K to Motion to Dismiss.

There can be no dispute that the statement at issue was germane to Ms. Wilkins' participation in her relationship with Director Patel. Mr. Seraphin sarcastically speculated that Ms. Wilkins is a "honeypot" and that there may be an ulterior motive for her relationship with Director Patel including his involvement in highly sensitive matters pertaining to the Trump administration.

Ms. Wilkins is wrong that Mr. Seraphin "deceptively attempts to define the controversy as being Ms. Wilkins' relationship with Dir. Patel." Dkt. 13, at p. 14. There is nothing deceptive about it. Ms. Wilkins' relationship with Director Patel is the entire basis of this lawsuit—undoubtedly, if she were not in a relationship with Director Patel, there would be no lawsuit pending here.

Ms. Wilkins' appearances on the podcasts cited herein—and her and other commentators' posts on X regarding Ms. Wilkins' relationship with Director Patel—pertain to a matter of public controversy. Therefore, Ms. Wilkins is a limited-purpose, if not a general-purpose, public figure.

### D.  Ms. Wilkins Cannot Show That Mr. Seraphin Acted With the Requisite Degree of Fault.

Ms. Wilkins' attempts to argue that Mr. Seraphin acted with actual malice are conclusory and warrant dismissal. Ms. Wilkins argues that Mr. Seraphin "met Ms. Wilkins with Mr. Patel and therefore knew that she is American and not Israeli, and that they were in a relationship *before* Patel became Director of the FBI; before President Trump was even re-elected." Dkt. 13, at pp. 17-18 (emphasis in original). Even assuming this meeting happened (which it did not), that does not impute knowledge to Mr. Seraphin regarding the matters at issue, such as her motives for dating Director Patel, her heritage or allegiances.

While Ms. Wilkins states she "very publicly stated prior to Defendant's statements that the allegations regarding her affiliation with Israel are false," she fails to show that Mr. Seraphin knew

that she disclaimed these allegations. Dkt. 13, at pp. 18. Mr. Seraphin's request for the Court to take judicial notice of Ms. Wilkins' public statements (so that the Court can put Ms. Wilkins' actions and this lawsuit in their proper context) does not impute knowledge to Mr. Seraphin regarding all of Ms. Wilkins' remarks at the time they were made.

Ms. Wilkins' assertions that "there was simply no basis to assert that [she] is a honeypot or a former Mossad agent"—and that "[Mr. Seraphin] fabricated it entirely"—are undermined by her own public interviews in which she acknowledged that someone doing "vigilante research" can come to the wrong conclusions about these topics based on information that is publicly available. *See* Exhibit I to Motion to Dismiss, at p. 2, 05:39.

Ms. Wilkins' reliance on *Hunt v. Liberty Lobby* is misplaced. 720 F.2d 631 (11th Cir. 1983). In that case, the court found that "[w]hen a story is not 'hot news,' 'actual malice may be inferred when the investigation . . . was grossly inadequate under the circumstances.'" *Id.* at 645 (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971) (ellipses in original)). Here, Ms. Wilkins' relationship with Director Patel is "hot news," which distinguishes this case from the *Hunt* case.

Ms. Wilkins' conclusory assertions that Mr. Seraphin "had motive to lie about Ms. Wilkins to self-promote his notoriety and profit"—and that he "projected his own racial animus against Dir. Patel"—do not establish actual malice. Dkt. 13, at pp. 18. Ms. Wilkins' contentions are pure speculation; she has not alleged any facts establishing that Mr. Seraphin harbored these motives, nor has she shown that he intended his statement to promote his "notoriety" or "profit."

Ms. Wilkins has failed to demonstrate that Mr. Seraphin made any statements with knowledge they were false or with reckless disregard of the truth. The cases relied on by Ms. Wilkins to argue otherwise are distinguishable. *See, e.g.*, *Levine v. CMP Publications, Inc.*, 738

F.2d 660, 675 (5th Cir. 1984) (statement that the plaintiff was "convicted of stealing" following a civil suit was made with actual malice when the defendant specifically advised the plaintiff that it was not a criminal case prior to the statement being made, and the defendant understood the difference between criminal and civil cases); *Brown v. Petrolite Corp.*, 965 F.2d 38, 47-48 (5th Cir. 1992) (affirming jury finding of actual malice after publishing a report purporting to show negative effects from a competitor's product when the defendant (1) presumed, but never verified, the source of the tested samples, (2) disregarded the ignorance of the nature of the samples, (3) overstated the test's findings, and (4) ignored other known tests that contradicted his report).

Even if the Court determines that Ms. Wilkins is not a public figure, Ms. Wilkins' complaint should still be dismissed. Ms. Wilkins has not established that Mr. Seraphin knew or should have known the statement was false. *See Rosenthal*, 529 S.W.3d at 440 (observing that a defendant acts negligently in the defamation context if the defendant "knew or should have known a defamatory statement was false, unless the content of the false statement would not warn a reasonably prudent editor or broadcaster of its defamatory potential.") (cleaned up). As explained above, Ms. Wilkins has not established that Mr. Seraphin knew about Ms. Wilkins' denial of these accusations—and even if he had known, Ms. Wilkins' denial does not establish the truth of the matter. Thus, Ms. Wilkins cannot establish that Mr. Seraphin acted with the requisite degree of fault.

### III.   CONCLUSION

For all of these reasons, the Court should grant Mr. Seraphin's Motion to Dismiss and dismiss Ms. Wilkins' claims against him with prejudice.

Respectfully Submitted:

| | |
|---|---|
| */s/ Daniel J. Hall* | */s/ Edward J. Loya, Jr.* |
| **CHRISTOPHER D. KRATOVIL** | **EDWARD J. LOYA, JR.** |
| State Bar No. 24027427 | State Bar No. 24103619 |
| **DANIEL J. HALL** | **DORSEY & WHITNEY LLP** |
| State Bar No. 24118946 | 200 Crescent Court, Suite 1600 |
| **DYKEMA GOSSETT PLLC** | Dallas, Texas 75201 |
| 1717 Main Street, Suite 4200 | Email: loya.edward@dorsey.com |
| Dallas, Texas 75201 | Tel.: (214) 981-9919 |
| E-mail: CKratovil@dykema.com | Fax: (214) 981-9901 |
| E-mail: DHall@dykema.com | **LEAD ATTORNEY FOR DEFENDANT KYLE M. SERAPHIN** |
| Tel.: (214) 462-6400 | |
| Fax: (214) 462-6401 | |
| **ATTORNEYS FOR DEFENDANT KYLE M. SERAPHIN** | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served in accordance with the FEDERAL RULES OF CIVIL PROCEDURE upon all parties on this the 9th day of December, 2025.

*/s/ Daniel J. Hall*
Daniel J. Hall